White J.
 

 delivered the following opinion of the court.
 

 James Brice was indicted, convicted and sentenced, in the circuit court, for having stolen a negro slave. The Indictment contains three counts. The verdict of the jury is general, not confined to any particular count.
 

 
 *255
 
 Various exceptions to the proceedings have been taken, and much argument employed, to show that the judgment of the circuit court should he reversed.
 

 First, it has been insisted, that as the finding of the jury was general, not confined to any particular count ; if it should be proved that any one count be bad, the judgment must be reversed. The court understands the law to be otherwise ; that each count is as a several indictment, and if any one count is good, although each of the others may be bad, yet it will give that judgment which the law would authorise upon the good count, supposing no other to be contained in the indictment. In this respect the law of England was different in civil and criminal cases. By a statute of Tennessee, the law is now in civil cases, as we understand it to be in criminal. 2 Doug. 730, 2 Ld. Rayd. 889,
 

 Second, it was urged with much earnestness, that the statute upon which this indictment was framed, was passed in North Carolina, in the year 1779, and is not in force in this state. And to support this position, several reasons have been assigned: First, that this statute was passed during the revolutionary war, when the crimes which the statute was intended to suppress, were frequent; and shat the occasion which gave rise to the statute having ceased, the statute itself ceased likewise.
 

 No doubt the turbulence of the times in which this statute was passed, put it in the power of those who were really dishonest, to practise thefts of this description, with much greater hopes of impunity than could be entertained in times of tranquility and peace ; and no doubt the frequency of offences, such as described in the statute, brought the subject to the notice of the legislature, and induced them to pass it. But in the statute itself there is no limitation, no time fixed when it shall cease to be in force. How then can the judiciary cease to regard it as the rule upon the subjects to which it relates ? It would be entirely a new idea, to say, that when a statute was passed to punish crimes, at that time frequent, and when that statute, or a sense of propriety, had made offenders against its provisions rare, that the judiciary should consider the statute a nullity, upon the maxim, “
 
 cessante ratione cessat et ipsa lex.”
 
 That there is such a maxim all will admit ; but few can seriously suppose it applicable to such a case as this. When the subject upon when the law is to operate ceases, then the law itself will
 
 *256
 
 likewise cease. Perhaps the legislature, if consulted, might say, the very circumstance of there being but few offenders at the present day, is owing to the provisions of the statute itself. And if it has been attended with such good effects, it ought to be continued in force, under a hope that it will ultimately prevent altogether, the commission of such crimes.
 

 In Tennessee there is a statute in flicting a severe punishment on those who are convicted of horse stealing. The very reason of passing this statute was the frequency of such offences. Now, they are less frequent; will any one argue; therefore, this statute is not in force ? Suppose the judiciary to sanction such an idea, what punishment would they inflict upon the offender ? Would it revive some old statute or go back to the common law
 
 ?
 
 In such a case it would be without any guide, but what its own discretion would furnish. This would at once put it in the place of makers, not expounders of the law. The argument in the case supposed, ought to have just as much force as in the one before the court. The truth is, if a statute is consistent with the constitution, and upon the face of it, is perpetual, the judiciary is bound to give it effect in every cast which falls within its previsions, until the legislature choose either expressly or impliedly to repeal it.
 

 Secondly, it has been said this statute is not in force, because in one of its sections, there is a provision that the clerk of each county court shall at stared times read the act publicly in court, and that this ceremony has never been used in this state. The court thinks with the counsel, that the object of this section was to make the act more generally known to the citizens, than it would be, if promulgated in the ordinary method only. But it is far from believing the legislature ever intended to put it in toe power of the county court clerks to determine, whether this act should be in force or not. There is nothing in the act itself, that countenances such an idea. If the clerks fail to do their duty, there is a penalty in the same section against them. Make them pay it. Still the law is it. force. Any other construction would lead to strange absurdities. In some counties the clerks might read the act as required
 
 ;
 
 in others it is neglected. Then, according to the argument, the statute would be in force in the first class of counties, but not in the latter. And still the statute, from its words in other parts, seems intended to operate throughout the whole states.
 

 Thirdly, it has been urged, that although this statute may at this time be in force in North Carolina, yet it is not in
 
 *257
 
 force in Tennessee. Because by Art. 10 and sched. to the constitution of this state, no law of North Carolina it enforced, except such as is consistent with our new form of government, and had been before in force and
 
 use
 
 in this part of the country
 
 ;
 
 that this statute had out been in
 
 use,
 
 and therefore, is not one of those that was enforced by that provision.
 

 In
 
 1779,
 
 when this statute was enacted, what is now Tennessee, formed a part of the state of North Carolina, and continued to be a part of it until ceded to the United states in 1789. During ten years, then, it would seem, this statute must have been, legally speaking, as much in force and use here as in any other part of North Carolina. In the act of cession, there is a provision that the laws of North Carolina, so far as is consistent with our new situation, should continue in force. The territorial government continued until the year 1796, when a constitution was formed, and Tennessee became a member of the union. In that constitution and in the article referred to, the members of the convention provide for a continuance of all the North Carolina laws which had been in force and use, and were not inconsistent with our form of government. It bar, not been pretended, and it would seem, cannot be, with propriety, that there is any provision in this statute inconsistent with our form of government while a territory, nor since we became a state. But the argument is, that it must be shown that this statute was in
 
 use
 
 as well as in
 
 force,
 
 during the territorial government, otherwise it is not one of those enforced by the constitution. Upon this point the record is silent, it does not show whether any individual was indicted under this statute or not, during the territorial government. Nor do we conceive it necessary such proof should be afforded. This state is not in the situation of a state adopting the laws of some foreign country, which laws must be proved, in order to enable the courts to know what they really were. In all our different changes we retained those laws to which we had been accustomed, and with the provisions of which we are presumed to have been acquainted, with the exception of those that, were inconsistent, first with the territorial, next with the state government. And it really would be a novelty to call for proof in every case, that depends upon any law except a statute of Tennessee, that such law had been in use in every form of government under which we had lived. To give this statute effect, we do not deem it necessary to know that
 
 *258
 
 any man was indicted under it during the territorial government. Every criminal law of North Carolina that was in force during the territorial government may be said to have been in
 
 me
 
 likewise. So long as the citizens conformed their conduct to the precepts of the laws, they
 
 used
 
 them. If they did those acts which the laws required they should perform, and abstained from the commission of those acts which the laws forbid, they used the laws. To make the law in use, it is not considered essential that there should have been an offender to whom the vindictive part was applied.
 

 Fourthly and lastly, it has been insisted this statute is not in force, because it is repealed by a statute of our own, passed in the year 1807. It is said to be repealed by this act of assembly, because the general assembly have there indicted a different punishment for larceny, and that this is larceny, therefore the latter must repeal the former statute. That there is no express repeal of the act of 1779 by expressly mentioning it, or by any particular description of it, we are therefore driven to the necessity of comparing the provisions
 
 of
 
 the two acts with each other, and by that means forming an opinion whether the same crime with which the prisoner is charged is embraced in the latter act, and, therefore, the first is repealed, One thing seems very evident, that several of the crimes mentioned in the act of 1779 are not noticed in the sct of 1807, and so far as respects them the act of 1779 is certainly not repealed. Taking off a slave by seduction, forcibly taking one away and taking off a free person with a view to sell him as a slave, are crimes by the act of 1779. punishable with deaths, and are not mentioned in that of 1807. Now if we suppose the act of 1779 still in force as to the offences mentioned, and repealed so far as respects the crime of stealing a slave, this consequence will follow, that for seducing a slave ta depart for the sake of gain, or taxing one away forcibly, or taking off a free person to sell as a slave, will be punished with death, while the crime of stealing a slave, will be punished as a larceny of personal goods with a punishment much more mild. Although slaves are by our law personal and not real property ; yet in many respects they stand in a different situation from ordinary personal goods. They are by most people supposed to be more valuable than any other description of personal property
 
 ;
 
 and we all know, that as they are rational beings, the crime of stealing them is more easily perpetrated, and is much more aggravated than that of stealing personal property of
 
 *259
 
 any other description. We are therefore satisfied the legislature when they passed the ant of 1807 did not intend to repeal that of 1779. There will be sufficient matter for the act of 1807 to operate upon, without affecting slaves, and as the punishment for this offence was not left the same, with ordinary larcenies by our laws as they stood before 1807, we believe the legislature did not intend to change their situation at that time in any respect. Notwithstanding the reasons assigned for supposing the act of 1779 not in force, we believe ourselves bound to consider it in force, and will proceed to an examination of other errors relied upon.
 

 Third, it was urged that no value or price for this negro is stated in the indictment.
 

 The reason why this is necessary in an indictment for larceny, is that the court may see whether the crime is grand or petit larceny, and thereby know how to proceed with the trial, and what punishment to inflict when the accused is convicted. Additional reasons can be assigned under our act of 1807 ; and we have no doubt chat if this were an ordinary larceny under the statute last named, that an indictment which alledged no price or value could not be supported. But in this case we do not think the objection of any avail. The act of 1779 says nothing respecting the value or price; if it be a slave, the property of another, no matter whether
 
 it
 
 is worth one dollar or one thousand ; the crime, mode of trial, and penalty are the same.
 

 Fourth, it is said this indictment is repugnant, and therefore erroneous. The repugnance hinted at, for it has not been distinctly stated, is that the indictment charges the prisoner with seducing and stealing the slave, and that these are distinct crimes by the statute, and ought not to have been blended in the same count. Suppose it to be true, that two distinct crimes cannot be charged in the same count, still we believe this objection not well founded. For, to us it seems evident, in this indictment, the seduction is only stated to show the manner in which the theft was perpetrated. Suppose this to have been unnecessary, still it will not vitiate, " utile
 
 per inutile non vitiatur."
 
 There is surely no repugnance in the two statements. Seducidg the slate, a human being, to agree to the theft might be one of the most effectual means of making the contemplated theft successful. Where an indictment is bad on account of repugnance, it must have some statement of facts inconsistent with each other. That is certainly not the case in the present instance.
 

 
 *260
 
 Fifth, If is said the record does not show that the circuit court received the indictment from the grand jury.
 

 In our opinion it shows that fact as clearly as is usual, and upon reading the record, no person can doubt the fact of their having received and acted upon it.
 

 In the last place it has been insisted that the indictment in describing the offence ought to pursue the words of the statute, which it does not in this case, for in the indictment the word
 
 carry
 
 away is used, whereas in the statute the word used, is
 
 coming
 
 away.
 

 The general, position here assumed is certainly sanctioned by authority. But upon examining this statute, the preamble and enacting part, and considering the whole, together, it appears the legislature itself, in this
 
 same act
 
 in describing this
 
 same offence,
 
 sometimes use the word convey, and sometimes the word carry. Having then, itself in the most unequivobal manner shown, that it viewed the words as synonimous, we consider ourselves bound to understand them as the framers of the statute did.
 

 After the most attentive examination we have been able to give this subject, we are unable to see any error in these proceedings which would, in our opinion, justify a reversal of this judgment, therefore it must be affirmed.
 

 The defendant was afterwards executed.